Case Nos. 14-5003, 14-5006

## UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

**MARY BISHOP**, et al.,

*Plaintiffs-Appellees*,

and

**SUSAN G. BARTON**, et al.,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

**SALLY HOWE SMITH**, in her official capacity as Court Clerk for Tulsa County, State of Oklahoma,

*Defendant-Appellant/Cross-Appellee*,

and

**THE UNITED STATES OF AMERICA**, ex rel. **ERIC H. HOLDER, JR.**, in his official capacity as Attorney General of the United States of America,

*Defendant*,

--------------------------------

**BIPARTISAN LEGAL ADVISORY GROUP OF THE U.S. HOUSE OF REPRESENTATIVES**, et al.,

*Intervenors-Defendants*.

On appeal from the United States District Court for the Northern District of Oklahoma,
Case No. 04-CV-848-TCK-TLW
The Honorable Terence C. Kern

## APPELLANT'S RESPONSE AND REPLY BRIEF

Byron J. Babione
David Austin R. Nimocks
James A. Campbell
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020 (t); (480) 444-0028 (f)
bbabione@alliancedefendingfreedom.org

John David Luton
Assistant District Attorney
District Attorney's Office (Tulsa)
500 South Denver Ave., Suite 900
Tulsa, OK 74103
(918) 596-4814 (t); (918) 596-4804 (f)
jluton@tulsacounty.org

*Attorneys for Sally Howe Smith*

*Oral Argument Set for April 17, 2014*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................1

ARGUMENT ..................................................................................................4

I.    *Baker* Forecloses Plaintiffs' Claims ................................................4

II.   The Fourteenth Amendment Does Not Forbid the Domestic-Relations
      Policy Reflected in the Marriage Amendment ...................................6

      A.    The Public Purpose of the Gendered-Marriage Institution Is to
            Channel the Presumptive Procreative Potential of Man-Woman
            Couples into Committed Unions for the Good of Children and
            Society ...................................................................................6

      B.    The Marriage Amendment Satisfies Rational-Basis Review..............12

      C.    Redefining Marriage Presents a Substantial Risk of Negatively
            Affecting Children and Society............................................16

      D.    Plaintiffs Have Not Shown that Heightened Scrutiny Applies to
            Their Claims ...........................................................................20

            1.    Heightened Scrutiny is Not Called for by *Romer*,
                  *Lawrence*, or *Windsor* ...............................................20

            2.    Neither the Purpose Nor Effect of the Marriage
                  Amendment Requires Heightened Scrutiny ..........................26

            3.    Binding Precedent of this Court Establishes that Sexual-
                  Orientation-Based Equal-Protection Claims Do Not
                  Apply Heightened Scrutiny.......................................33

            4.    The Marriage Amendment Does Not Impermissibly
                  Discriminate on the Basis of Sex, and Thus Heightened
                  Scrutiny Does Not Apply.......................................38

            5.    Plaintiffs' Claims Do Not Implicate a Fundamental
                  Right, and Thus Heightened Scrutiny Does Not Apply ...........39

i

III.    Plaintiffs Cannot Satisfy the Causation or Redressability Requirement
        of Standing for Any of their Claims ................................................44

IV.     Plaintiffs Barton and Phillips Cannot Prevail on their Recognition
        Claim .............................................................................................47

        A.      Plaintiffs Barton and Phillips Lack Standing to Bring their
                Recognition Claim against Smith .........................................47

        B.      Plaintiffs Cannot Invoke State Severability Principles to
                Expand the Court's Jurisdiction .........................................51

        C.      Plaintiffs Barton and Phillips's Recognition Claim Lacks Merit .......52

CONCLUSION ........................................................................................60

CERTIFICATE OF COMPLIANCE ......................................................61

CERTIFICATE OF DIGITAL SUBMISSION ......................................62

CERTIFICATE OF SERVICE ...............................................................63

## TABLE OF AUTHORITIES

**Cases**

*Adoptive Couple v. Baby Girl*,
    133 S. Ct. 2552 (2013)......................................................................14

*American Meat Institute v. Pridgeon*,
    724 F.2d 45 (6th Cir. 1984) ...........................................................52

*Arthur v. City of Toledo, Ohio*,
    782 F.2d 565 (6th Cir. 1986) .................................................... 27-28

*Atkeson v. Sovereign Camp, W.O.W.*,
    216 P. 467 (Okla. 1923).................................................... 56, 58-60

*Atlantic Refining Co. v. Oklahoma Tax Commission*,
    360 P.2d 826 (Okla. 1959).......................................................... 26-27

*Baca v. King*,
    92 F.3d 1031 (10th Cir. 1996) .......................................................49

*Baker v. General Motors Corp.*,
    522 U.S. 222 (1998).......................................................................57

*Baker v. Nelson*,
    409 U.S. 810 (1972)................................................................... 4-6

*Bishop v. Oklahoma*,
    447 F. Supp. 2d 1239 (N.D. Okla. 2006) .................................. 48-49

*Bishop v. Oklahoma*,
    333 F. App'x 361 (10th Cir. 2009).................................................48

*Bowers v. Hardwick*,
    478 U.S. 186 (1986).................................................................25, 35

*Bronson v. Swensen*,
    500 F.3d 1099 (10th Cir. 2007) ...................................................47

*Christian Legal Society v. Martinez*,
    130 S. Ct. 2971 (2010)...............................................................25

*Citizens for Equal Protection v. Bruning*,
    455 F.3d 859 (8th Cir. 2006) ..................................................... 6-7, 23, 31, 34

*City of Cleburne v. Cleburne Living Center, Inc.*,
    473 U.S. 432 (1985)........................................................... 33-34, 36

*Clarke v. City of Cincinnati*,
    40 F.3d 807 (6th Cir. 1994) .................................................... 27-28

*Coffe & Carkener v. Wilhite*,
    156 P. 169 (Okla. 1916)........................................................ 56-57

*Collins v. Harker Heights*,
    503 U.S. 115 (1992).................................................................44

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) .........................................................52

*Craig v. Boren*,
    429 U.S. 190 (1976).................................................................35

*Daimler Chrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).................................................................52

*DeSantis v. Pacific Telephone & Telegraph Co., Inc.*,
    608 F.2d 327 (9th Cir. 1979) .........................................................35

*District Attorney's Office for Third Judicial District v. Osborne*,
    557 U.S. 52 (2009).............................................................39, 44

*FCC v. Beach Communications, Inc.*,
    508 U.S. 307 (1993)...................................................................9

*Fent v. Henry*,
    257 P.3d 984 (Okla. 2011)..........................................................45

*Finstuen v. Crutcher*,
    496 F.3d 1139 (10th Cir. 2007) ................................................ 26-27, 57

*Franchise Tax Board of California v. Hyatt*,
    538 U.S. 488 (2003)..................................................................57

*Frank v. United States*,
    129 F.3d 273 (2d Cir. 1997) ..........................................................................51

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).......................................................................................37

*Hendrick v. Walters*,
    865 P.2d 1232 (Okla. 1993)..........................................................................45

*Hernandez v. Robles*,
    855 N.E.2d 1 (N.Y. 2006) ................................................................. 24-25, 34

*Hilton v. Guyot*,
    159 U.S. 113 (1895).......................................................................................56

*Illinois State Board of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979).........................................................................................5

*Jantz v. Muci*,
    976 F.2d 623 (10th Cir. 1992) ................................................................. 34-35

*Johnson v. Robison*,
    415 U.S. 361 (1974)................................................................................13, 16

*Lawrence v. Texas*,
    539 U.S. 558 (2003)........................................ 20-22, 24-26, 35-36, 39-40, 43

*Lewis v. Casey*,
    518 U.S. 343 (1996).................................................................................. 51-52

*Lofton v. Secretary of the Department of Children & Family Services*,
    358 F.3d 804 (11th Cir. 2004) ................................................................19, 21

*Loving v. Virginia*,
    388 U.S. 1 (1967)................................................................ 2, 6, 12, 38, 40-41

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................50

*Maher v. Roe*,
    432 U.S. 464 (1977).......................................................................................25

*Mandel v. Bradley*,
    432 U.S. 173 (1977).................................................................................4

*Maynard v. Hill*,
    125 U.S. 190 (1888).................................................................................6

*McDonald v. City of Chicago, Illinois*,
    130 S. Ct. 3020 (2010)..........................................................................39

*Miller v. Miller*,
    956 P.2d 887 (Okla. 1998)................................................................... 7-8

*Mudd v. Perry*,
    235 P. 479 (Okla. 1925).........................................................................8

*Myatt v. Ponca City Land & Improvement Co.*,
    78 P. 185 (Okla. 1903).........................................................................56

*National Gay Task Force v. Board of Education of City of Oklahoma City*,
    729 F.2d 1270 (10th Cir. 1984) ........................................................ 35-36

*New England Health Care Employees Pension Fund v. Woodruff*,
    512 F.3d 1283 (10th Cir. 2008) ............................................................45

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932)..............................................................................54

*North v. McMahan*,
    110 P. 1115 (Okla. 1910).....................................................................26

*Oregon v. Ice*,
    555 U.S. 160 (2009)..............................................................................53

*Pacific Employers Insurance Co. v. Industrial Accident Commission*,
    306 U.S. 493 (1939)..............................................................................57

*Palmer v. Thompson*,
    403 U.S. 217 (1971)..............................................................................27

*Parham v. J.R.*,
    442 U.S. 584 (1979)..............................................................................20

*Price-Cornelison v. Brooks*,
    524 F.3d 1103 (10th Cir. 2008) ........................................................ 20, 33-37

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................................51

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*,
    123 F.3d 111 (3d Cir. 1997) ....................................................................49

*Quiban v. Veterans Administration*,
    928 F.2d 1154 (D.C. Cir. 1991) ...............................................................37

*Reno v. Flores*,
    507 U.S. 292, 303 (1993) .........................................................................40

*Rich v. Secretary of the Army*,
    735 F.2d 1220 (10th Cir. 1984) ........................................................... 35-36

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989) ..................................................................................4

*Romer v. Evans*,
    517 U.S. 620 (1996) ..........................................................20, 22-24, 26, 35-36

*Ross v. Bryant*,
    217 P. 364 (Okla. 1923) ..................................................................55-56, 58-59

*Southern Alameda Spanish Speaking Organization v. City of Union City, California*,
    424 F.2d 291 (9th Cir. 1970) ....................................................................28

*Seegmiller v. LaVerkin City*,
    528 F.3d 762 (10th Cir. 2008) .......................................................... 20-21, 39

*SmithKline Beecham Corp. v. Abbott Laboratories*,
    740 F.3d 471 (9th Cir. 2014) ...................................................................22

*Sosna v. Iowa*,
    419 U.S. 393 (1975) ..................................................................................3

*Strauss v. Horton*,
  207 P.3d 48 (Cal. 2009) ........................................................................... 23-24

*Tully v. Griffin, Inc.*,
  429 U.S. 68 (1976) ..................................................................................... 4-5

*Turner v. Safley*,
  482 U.S. 78 (1987) ........................................................................................41

*United States v. Carolene Products Co.*,
  304 U.S. 144 (1938) ......................................................................................36

*United States v. Hays*,
  515 U.S. 737 (1995) .................................................................................. 44-45

*United States v. Windsor*,
  133 S. Ct. 2675 (2013) ..........................................................................*passim*

*Vance v. Bradley*,
  440 U.S. 93 (1979) .......................................................................................14

*Walmer v. U.S. Department of Defense*,
  52 F.3d 851 (10th Cir. 1995) ................................................................... 34-36

*Warth v. Seldin*,
  422 U.S. 490 (1975) ......................................................................................52

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) .............................................................................. 39-41, 44

*Wessel v. City of Albuquerque*,
  463 F.3d 1138 (10th Cir. 2006) ...................................................................49

*Wilson v. Cook*,
  100 N.E. 222 (Ill. 1912) ...............................................................................59

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012) .........................................................................21

*Zablocki v. Redhail*,
  434 U.S. 374 (1978) ............................................................................2, 6, 12

## Constitutional Provisions

Oklahoma Constitution Article I, Section 2.........................................................22, 54

United States Constitution Article IV, Section 1 ...................................................57

## Statutes and Bills

Oklahoma Statute Title 43, Section 5 ....................................................................47

Oklahoma Statute Title 43, Section 101 ..................................................................7

## Amicus Briefs supporting Appellant

Amicus Brief of Concerned Women for America (filed in *Kitchen v. Herbert*) ................................................................................29, 36

Amicus Brief of Center for Constitutional Jurisprudence et al. ............ 42, 44, 54-55

Amicus Brief of Helen M. Alvaré ...................................................................6, 11

Amicus Brief of Family Research Council...........................................................13

Amicus Brief of Robert P. George et al................................................... 15-17, 19

Amicus Brief of Alan J. Hawkins et al .............................................................. 16-19

Amicus Brief of Indiana et al........................................................................ 7, 12-13

Amicus Brief of Michigan ..............................................................................7, 12

Amicus Brief of Dr. Paul McHugh Brief.................................................................37

Amicus Brief of Scholars of History et al.......................................................1, 9, 42

Amicus Brief of Professors of Social Science .................................................. 19-20

Amicus Brief of United States Conference of Catholic Bishops et al............... 28-29

## Amicus Briefs supporting Appellees

Amicus Brief of Anti-Defamation League et al........................................... 26, 28-29

Amicus Brief of Bay Area Lawyers for Individual Freedom et al. ..................18, 53

Amicus Brief of Episcopal Diocese of Utah et al....................................................29

Amicus Brief of Historians of Marriage .......................................................... 17-18

Amicus Brief of OutServe-SLDN et al....................................................................53

## Other Authorities

American Psychiatric Association, *LGBT-Sexual Orientation*, *available at* http://psychiatry.org/mental-health/people/lgbt-sexual-orientation (last visited Apr. 1, 2014) .....................................................................................37

Brian Barber, *Ban on gay marriage debated*, Tulsa World, Oct. 13, 2004.............28

Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* (1st ed. 1852) ...................................................................................... 11, 42-43

Black's Law Dictionary (8th ed. 2004) ...................................................................41

William Blackstone, Commentaries ..................................................................8, 20

Ray Carter, *Marriage question among most popular on state ballot*, Journal Record, Oct. 12, 2004 ....................................................................................29

Robert Evatt, *Local 'Pro-Marriage Rally' takes aim at same-sex unions*, Aug. 25, 2004 ................................................................................................28

John R. Searle, *The Construction of Social Reality* (1995) ....................................15

Restatement (Second) of Conflict of Laws (1971) ..................................................56

Richard Socarides, *Obama and Gay Marriage: One Year Later*, The New Yorker, May 6, 2013, *available at* http://www.newyorker.com/online/blogs/newsdesk/2013/05/obama-and-gay-marriage-one-year-later.html........................................................... 36-37

Irving G. Tragen, *Statutory Prohibitions against Interracial Marriage*, 32 Cal. L. Rev. 269 (1944) ................................................................................42

Lynn Wardle and Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 How. L.J. 117 (2007) ........................................................................................................42

Noah Webster, *An American Dictionary of the English Language* (1st ed. 1828) ..................................................................................................41

## INTRODUCTION

Under the gendered view of marriage—which has prevailed throughout recorded history in virtually all societies, and has been democratically preserved in the majority of States—marriage's principal public purpose is to channel potentially procreative sexual relationships into stable unions for the sake of responsibly producing and raising the next generation. That understanding of marriage has been recognized throughout history by scholars in myriad academic disciplines, as well as lawmakers and courts that have given legal recognition and effect to marriage. *See* Aplt.Br.23-28; Scholars of History Amicus Br. at 4-19 ("Scholars of History Br.").

In reaffirming the man-woman marriage institution and its associated purposes, Oklahomans confirmed the gendered view of marriage in their State, believing that, in the long run, it will best serve their community and the State's children in particular. The challenged Marriage Amendment simply maintains the State's longstanding practice of distinguishing between couples who further marriage's procreative and child-related purposes and couples who categorically do not. The rationality of that decision is unimpeachable.

But Plaintiffs and their amici deride the gendered view of marriage and deny that its enduring purpose is to channel potentially procreative sexual relationships into stable unions. They seek to replace that well-supported view of marriage with

their genderless, adult-centered conception. According to them, marriage exists to recognize the "love," "lifelong commitment," and "dignity" of adult relationships. Aplee.Br.27, 54. Yet because Plaintiffs' view severs the abiding connection between marriage and the unique procreative potential of male-female relationships, they cannot explain why the institution is a ubiquitous, cross-cultural feature of the human experience or why, as the Supreme Court has repeatedly emphasized, marriage is "fundamental to our very existence and survival." *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *accord Zablocki v. Redhail*, 434 U.S. 374, 383-84 (1978). Plaintiffs thus have not disproven the gendered view's procreative and child-related objectives, or shown that same-sex couples advance or threaten those objectives in the same manner, or to the same degree, that man-woman couples do. As a result, Plaintiffs' constitutional challenge must fail.

The Supreme Court recently stressed that the States have "essential authority to define the marital relation," *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013), that the power to define marriage is within the "province of the States," *id.* at 2691, and that the federal government traditionally "defer[s] to [such] state-law policy decisions." *Id.* Plaintiffs treat as empty rhetoric all these assurances of the States' authority over the definition of marriage, effectively arguing that the Fourteenth Amendment requires a genderless definition of marriage throughout the Nation. Yet that constitutional interpretation would contravene the Supreme

Court's consistent affirmation of the States' "absolute right" to define marriage for their communities. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *see also Windsor*, 133 S. Ct. at 2689-91.

In seeking to federalize a definition of marriage, Plaintiffs gloss over the important public-policy determinations inherent in the State's regulation of marriage and its definition. These questions require a balancing of factors, competing interests, and sensitive policy considerations, all of which impact a bedrock social institution of undeniable real-world importance. For the rational and compelling reasons explained in the opening brief, Oklahomans and the People in 33 other States sincerely believe that the man-woman marriage institution best serves their communities. A day may come when they see it differently—or perhaps not. But it is certain that a decision turning back Plaintiffs' claims would preserve that freedom for the People. In contrast, a decision striking down the Marriage Amendment would permanently install a genderless-marriage institution as federal domestic-relations policy nationwide. In that world, the People could never recapture the man-woman marriage institution, regardless of what the best interests of society might dictate. This Court should decline to bring about that result, and instead should leave these foundational domestic-relations questions where they belong—with the People.

3

## ARGUMENT

### I. *Baker* Forecloses Plaintiffs' Claims.

Plaintiffs, like the District Court, do not deny that the questions raised here are identical to the questions presented and thus decided in *Baker v. Nelson*, 409 U.S. 810 (1972). They nonetheless argue that *Baker* does not control because of subsequent doctrinal developments. Aplee.Br.29. This argument fails.

Subsequent doctrinal developments do not permit a lower court to ignore directly-on-point Supreme Court precedent. Contrary to Plaintiffs' argument (at p. 29 n.25), this is true regardless of whether the directly-on-point Supreme Court precedent is a decision rendered after full briefing and argument, *see Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("[i]f a precedent of th[e] Court has direct application in a case, . . . the [lower court] should follow the case which directly controls"), or whether it is a summary disposition. *See Tully v. Griffin, Inc.*, 429 U.S. 68, 74 (1976) (stating that a summary disposition remains "a controlling precedent, unless and until re-examined by th[e] [Supreme] Court"); *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (stating that summary dispositions "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided").

Trying to resist this, Plaintiffs inaccurately claim that summary dispositions have less precedential force over lower courts than do Supreme Court decisions

issued after full briefing and argument. Although the Supreme Court has stated that a summary decision "is not *here*," that is, before the Supreme Court, "of the same precedential value as would be an opinion of th[e] Court," *Tully*, 429 U.S. at 74 (emphasis added; quotation marks omitted), the Court has not indicated that directly-on-point summary dispositions are less authoritative over lower courts. Plaintiffs (at p. 28) attempt to support their argument by quoting *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 180-81 (1979), but that case, which discussed a summary decision's "precedential value" in the Supreme Court (not over a lower court), does not advance their cause. *Id.* at 181 (stating that the Supreme Court itself "has not hesitated to discard a rule which a line of summary affirmances may appear to have established").

Even if this Court were to conclude that lower courts are free to assess whether doctrinal developments have released them from on-point Supreme Court precedent, it is not sufficient for the alleged developments to demonstrate merely that the Supreme Court would now consider the question "substantial." Aplee.Br.30. Instead, the intervening case law must unmistakably show that the Supreme Court would decide the question differently than it did in its summary decision. But none of the alleged developments identified by Plaintiffs establishes that the Supreme Court has overruled *Baker*'s merits ruling on the due-process and

5

equal-protection claims presented here. Aplt.Br.22-23, 28-31. This Court should thus conclude that *Baker* forecloses Plaintiffs' claims.

## II. The Fourteenth Amendment Does Not Forbid the Domestic-Relations Policy Reflected in the Marriage Amendment.

### A. The Public Purpose of the Gendered-Marriage Institution Is to Channel the Presumptive Procreative Potential of Man-Woman Couples into Committed Unions for the Good of Children and Society.

Marriage's public purpose of channeling the presumptive procreative potential of man-woman couples into committed unions for the good of children and society is well supported by law, history, and the work of scholars in all relevant fields. Plaintiffs' attacks (at pp. 51-55) have clearly not refuted it.

For starters, the Supreme Court has repeatedly recognized that marriage is "fundamental to the very existence and survival of the [human] race." *Zablocki*, 434 U.S. at 384; *accord Loving*, 388 U.S. at 12. And it has observed that without marriage "there would be n[o] civilization." *Maynard v. Hill*, 125 U.S. 190, 211 (1888). These statements, as well as others by the Supreme Court, unquestionably reflect marriage's purpose of serving procreative and childrearing goals. *See* Helen M. Alvaré Amicus Br. at 11-20 ("Alvaré Br.") (citations to this brief refer to the pagination reflected in the brief's ECF header).

In addition, the Eighth Circuit has acknowledged that "the expressed intent of traditional marriage laws" is "to encourage heterosexual couples to bear and

raise children in committed marriage relationships." *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 868 (8th Cir. 2006). And as that court observed, "a host of judicial decisions" have recognized "the government interest in 'steering procreation into marriage'" and concluded that "laws defining marriage as the union of one man and one woman and extending a variety of benefits to married couples are rationally related to" that interest. *Id.* at 867; *see also* Aplt.Br.58-59 (citing ten additional cases); State of Indiana Amicus Br. at 20-21 ("Indiana Br.") (citing fifteen total cases). Also, the various States that have supported the Marriage Amendment's constitutionality have all confirmed that "[c]ivil marriage recognition arises from the need to protect the only procreative sexual relationship that exists[.]" Indiana Br. at 15-17 (joined by ten States); State of Michigan Amicus Br. at 7-10 ("Michigan Br.") ("Marriage is rooted in the unique capacity of the union of one man and one woman to bear children."); Utah Opening Br. at 52-53 (similar) (filed in *Kitchen v. Herbert*).

Many facets of Oklahoma law discussed in the opening brief, such as the provision permitting divorce when "the wife[,] at the time of her marriage, was pregnant by another than her husband," Okla. Stat. tit. 43, § 101, demonstrate marriage's close connection to procreation. *See* Aplt.Br.27. Also, the Oklahoma Supreme Court has acknowledged that a mother's statement about her child's biological relationship with her putative father "goes to the essentials of the marital

relationship." *Miller v. Miller*, 956 P.2d 887, 904 (Okla. 1998). In contrast, that court has recognized that statements about "affection," "love," and "commitment"—Plaintiffs' asserted purposes of marriage—do not "go to the essence of the marital relationship." *Id.* at 903.

The Marriage Amendment, moreover, reaffirms the common-law definition of marriage that has always governed in Oklahoma, *see Mudd v. Perry*, 235 P. 479, syllabus (Okla. 1925), *superseded on other grounds as recognized in Copeland v. Stone*, 842 P.2d 754, 757-59 (Okla. 1992), and, accordingly, seeks to further the common-law purposes of marriage. When discussing the common law, Blackstone stressed that the "great relation[]" of "husband and wife . . . prescrib[es] the manner in which th[e] natural impulse" "to continue and multiple [the] species" is "regulated," that the "principal end and design" of marriage is to create the relation of "parent and child," and that it is by virtue of marriage "that infants are protected, maintained, and educated." 1 William Blackstone, Commentaries *410 (Aplt.App.331). By preserving the common-law definition of marriage, Oklahoma's marriage laws have thus always sought to achieve these laudable purposes.

Furthermore, because marriage is a social institution that transcends legal regulation, it is appropriate to look beyond the law when assessing the public purposes of marriage. *See* Aplt.Br.64-65. Peering through that lens reveals many

eminent anthropologists, sociologists, jurists, philosophers, and historians who recognize marriage's enduring purpose of "encouraging the potentially procreative relationships of men and women to take place in a setting where the children who may result have the opportunity to know and be reared by [their] mother and father." Scholars of History Br. at 4-19; *see also* Aplt.Br.23-28.[1]

*Plaintiffs Have Diminished, Distorted, and Failed to Refute this Public Purpose of Marriage.* Plaintiffs diminish society's procreative and childrearing interests in marriage by focusing solely on marriage's role in providing for "unintended children," Aplee.Br.51, while ignoring marriage's vital interests in encouraging stable homes where children will be raised by their own mother and father, and encouraging fathers to commit to their children's mothers and jointly raise their offspring. *See* Aplt.Br.16-17, 46-55. Smith discussed all these purposes in her opening brief. *See id.* But Plaintiffs overlook them.

Additionally, Plaintiffs distort marriage's purpose of steering *potentially* procreative relationships into stable unions by suggesting that this purpose depends on each individual's "intent" or "capability to beget children." Aplee.Br.52. But as Smith has already explained, society's interest in marriage is not to ensure that all

---

[1] Even if no authority supported this enduring purpose of marriage, it would matter not to this Court's analysis, for rational-basis review asks "whether there is any *conceivable* rational basis justifying [a challenged] distinction," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 309 (1993) (emphasis added), and Plaintiffs have the burden "to negative *every conceivable* basis which might support it." *Id.* at 315 (quotation marks omitted; emphasis added).

people who marry will have children. Aplt.Br.59-60. Instead, it is to channel the presumptive procreative *potential* of man-woman relationships into enduring marital unions so that *if* any children are born, they are more likely to be raised in stable family units by both their mothers and fathers. *Id.*

Plaintiffs also confuse the private and public purposes for marriage, observing that "millions of Oklahomans" have "exchange[d] vows of lifelong commitment" because they have decided "to love and to cherish" each other. Aplee.Br.54. Smith, however, has never denied the private purposes of marriage— that couples marry for love, commitment, emotional support, personal fulfillment, and a variety of other personal reasons. Aplt.Br.23. But because Plaintiffs want the State to change the law's (public) definition of marriage, the analysis here looks at the government's purposes for, and society's interest in, marriage as a social institution.

Plaintiffs then astoundingly declare that "the very limited criteria that render an adult incapable of marrying under Oklahoma law have absolutely nothing to do with 'presumptive procreative potential.'" Aplee.Br.53. Yet the very definition of marriage in Oklahoma (one man and one woman) confines marriage to the type of sexual relationships (man-woman relationships) that have presumptive procreative potential. Moreover, some of Oklahoma's other marriage requirements, such as the constraint that spouses may not be too closely related by blood, directly implicate

procreative concerns. *See* Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* § 220 (1st ed. 1852) (Aplt.App.310) (noting that marriages between close blood relatives "are frequently disastrous to the interests of the parties and their *enfeebled children*" (emphasis added)).

*Plaintiffs' View of and Purpose for Marriage Cannot Withstand their Own Attacks.* Plaintiffs claim that the government purpose of marriage discussed in Smith's opening brief lacks legal support, *see* Aplee.Br.51, but truth be told, it is Plaintiffs' asserted purpose of marriage that finds no support in Oklahoma law. After all, the government does not have any interest in who a person loves, and thus no statute requires a couple to pledge their "love" before marrying. *Id.* at 54. Nor does Oklahoma law suggest, let alone establish, that the State recognizes and regulates marriage for the purpose of conferring "dignity" on couples. *Id.* at 27.

Furthermore, it is Plaintiffs (not Smith) who have adopted a "diminishe[d]" and "impoverished" view of marriage. *Id.* at 25, 51. They reduce marriage from an institution that exists to benefit children and society, and relegate it to a mere stamp through which the government approves loving, emotional unions between adult couples. *See* Aplt.Br.76-77; Alvaré Br. at 20-21 (citations to this brief refer to the pagination reflected in the brief's ECF header).

Plaintiffs, moreover, encounter other difficulties in defending their genderless view of marriage. Notably, they cannot offer any explanation for why

11

the institution is a ubiquitous, cross-cultural feature of the human experience or why marriage is, as the Supreme Court has repeatedly emphasized, "fundamental to our very existence and survival." *Loving*, 388 U.S. at 12; *accord Zablocki*, 434 U.S. at 383-84. What is more, Plaintiffs' conception of marriage cannot rationally resist further alterations to the definition of this vital social institution. *See* Aplt.Br.81-82; Indiana Br. at 26-29; Michigan Br. at 19. Plaintiffs have thus failed to offer a coherent view of marriage and its purposes.

### B.    The Marriage Amendment Satisfies Rational-Basis Review.

The Marriage Amendment distinguishes between man-woman couples and same-sex couples because of an undeniable biological difference between them—namely, the natural capacity to create children. The Marriage Amendment satisfies rational-basis review because, in light of this biological difference, same-sex couples neither advance nor threaten society's procreative and child-related interests in marriage in the same manner, or to the same degree, that sexual relationships between men and women do. Aplt.Br.55-59.

Seeking to rebut this rational-basis analysis, Plaintiffs mirror the District Court's error in inverting the rational-basis standard and insisting that Smith must show that "barring same-sex couples from marrying makes opposite-sex couples *more* inclined to marry." Aplee.Br.56. Yet Smith and her amici have already demonstrated at length that this is not the appropriate inquiry under rational-basis

review. Aplt.Br.55-56; Indiana Br. at 24-26; Family Research Council Amicus Br. at 20-23.

By insisting on the proper analysis, Smith does not ask this Court to "close [its] eyes" to same-sex couples and "examine only whether *including* opposite-sex couples in marriage furthers the State's asserted interests." Aplee.Br.60 n.32. Rather, this Court must also assess whether including same-sex couples in marriage would further the State's interests in providing stability to the types of relationships that result in unplanned pregnancies, encouraging the rearing of children by both their mother and their father, and encouraging men to commit to the mothers of their children and jointly raise the children they beget. Aplt.Br.55 (citing *Johnson v. Robison*, 415 U.S. 361, 383 (1974)). Redefining marriage to include same-sex couples plainly would not further those interests,[2] and thus the Marriage Amendment satisfies rational-basis review.

In the opening brief, Smith has shown that marriage encourages biological parents to enter committed unions and raise their children together, Aplt.Br.24-28,

---

[2] Plaintiffs' assertion that redefining marriage to "includ[e] same-sex couples would *promote*" the State's interests in marriage rests on Plaintiffs' re-characterizing the relevant interests at a high level of abstraction (e.g., "promoting a 'stable family unit' for the 'benefit of children and society'") that distorts the interests Smith has asserted. Aplee.Br.58-59; *see also id.* at 72 n.36 (claiming incorrectly that Smith asserts the purpose "of promoting legally secure two-parent households in the interest of children"). This is reminiscent of Plaintiffs' error in broadly describing, and thus reshaping, the fundamental right to marry. *See infra* at 40-41.

56-57, and that encouraging stable biological homes is a compelling government interest. *Id.* at 49-52. In response, Plaintiffs claim that "children raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents." Aplee.Br.57. Even if that contested point (discussed below, *see infra* at 19-20) were true, that does not undermine the research indicating that, on average, children develop best when raised by their *biological* mothers and fathers in a stable family unit. *See* Aplt.Br.50-51. Nor does it refute the importance of protecting children's legal and intangible "interest[s] in knowing their biological parents." *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2582 (2013) (Sotomayor, J., dissenting); *see also* Aplt.Br.51-52.

Plaintiffs also argue that the line drawn by the Marriage Amendment is "underinclusiv[e]" because "it does not bar any other class of Oklahoma couples based on their lack of 'procreative potential.'" Aplee.Br.59. But Plaintiffs do not dispute that same-sex couples are categorically infertile or that sexual relationships between a man and a woman presumptively have the natural capacity to (and, in the vast majority of cases, actually do) produce children. *See* Aplt.Br.61-62 n.12. Those undisputed facts alone satisfy rational-basis review because even if a classification "is to some extent both underinclusive and overinclusive, . . . it is nevertheless the rule that . . . perfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (quotation marks omitted).

Nonetheless, Smith has already explained that the Marriage Amendment is not underinclusive because permitting infertile spouses in man-woman couples to marry furthers society's interest in responsibly creating and rearing children, and because government inquiry into the procreative potential or plans of man-woman couples would impinge upon constitutionally protected privacy rights. Aplt.Br.59-62. Also, given that marriage is a social institution, every marriage between a man and a woman—regardless of the participants' reproductive intentions, abilities, or outcomes—strengthens the man-woman marriage institution, expands its social influence, and enhances the messages it communicates to the public. *See* John R. Searle, *The Construction of Social Reality* 57 (1995) ("Cars and shirts wear out as we use them but constant use renews and strengthens institutions such as marriage"). In contrast, legally redefining marriage would communicate messages (e.g., that marriage has no intrinsic connection to procreation, that there is nothing particularly valuable about a child being raised by her own mother and father, and that an emotional or romantic connection is the defining characteristic of marriage) that directly undermine the interests that the State seeks to further. *See* Aplt.Br.72-76; Robert P. George Amicus Br. at 28 ("George Br."). Hence, the line drawn by the Marriage Amendment is not just rational, but carefully tailored to the State's compelling purposes.

Finally, "a common characteristic shared by beneficiaries and nonbeneficiaries alike, is not sufficient to invalidate a [law] when other characteristics peculiar to only one group rationally explain the [law's] different treatment of the two groups." *Johnson*, 415 U.S. at 378. Therefore, Plaintiffs cannot prevail even if there are other purposes for marriage besides steering the presumptive procreative potential of man-woman couples into committed unions, and even if same-sex couples are similarly situated to man-woman couples for some of those purposes.

### C. Redefining Marriage Presents a Substantial Risk of Negatively Affecting Children and Society.

Plaintiffs, like the District Court, insist that, no matter the standard of review, the government must demonstrate that *excluding* same-sex couples furthers the State's purpose for marriage by, for example, preventing adverse consequences that might accompany marriage's redefinition. Aplee.Br.55-63. Even though such a showing is not required here, Smith and her amici have demonstrated that redefining marriage presents a substantial risk of negatively affecting children and society by hindering marriage's ability to further the vital procreative and child-focused interests that it has always advanced. *See, e.g.*, Aplt.Br.63-86; George Br. at 14-24; Alan J. Hawkins Amicus Br. at 16-28 ("Hawkins Br."). Rather than engaging these arguments, Plaintiffs flatly assert, without explanation, that projecting these adverse consequences is "irrational" and "fantastical."

16

Aplee.Br.25, 61-62. But these bald statements do not begin to refute the real concerns posed by a fundamental redefinition of a bedrock social institution like marriage.[3]

The adverse anticipated social consequences would result in large part from the various messages that the government communicates through a genderless-marriage regime. Aplt.Br.64-66, 72-82. Those messages include, to name a few, that procreation is not intrinsically connected to marriage, *id.* at 72, that there is nothing particularly valuable about a child being raised by her own mother and father, *id.* at 74, and that an emotional or romantic connection is the defining feature of marriage. *Id.* at 74-75. It is logical for the State to forecast that the government's communication of those messages, over time, would bring about changes in marital norms that contribute to adverse social consequences, such as decreasing the likelihood that man-woman couples having or raising children will marry, and increasing the instability of marriages in general. *See id.* at 72-82; George Br. at 14-20; Hawkins Br. at 16-28. Underscoring the force of these arguments, even Plaintiffs' own amici admit that marriage, as a "complex

---

[3] Choosing inflammatory rhetoric over reasoned argument, Plaintiffs attack Smith's observation that a genderless-marriage institution would "undermine other stabilizing marital norms." Aplt.Br.81-82 (capitalization omitted). Plaintiffs claim, without citation or explanation, that Smith's argument "is based on nothing more than invidious stereotype." Aplee.Br.62. But nothing about anticipating that adverse future development invokes (let alone rests on) stereotype of any relationship or individual.

institution," "conveys meanings and consequences" to the public, *see* Historians of Marriage Amicus Br. at 3, and that marriage plays "a critical 'signaling' role" that "establishes norms for how . . . married individuals conduct themselves." Bay Area Lawyers for Individual Freedom Amicus Br. at 8 ("Bay Area Lawyers Br.").

Plaintiffs try to divert attention from the issue at hand, arguing that the adverse projected consequences discussed in the opening brief result not from redefining marriage, but from other legal changes such as no-fault divorce. Aplee.Br.62-63. Although no-fault divorce, by undermining the permanence of marriage, has changed marital norms in a way that has undoubtedly contributed to a lack of stability in marriages, *see* Aplt.Br.69-71, redefining marriage would reshape the very essence of the marital relation—a change that would likely bring about more far-reaching consequences. *See id.* at 72-82. For example, by communicating that there is nothing particularly valuable about a child being raised by her own mother and father, redefining marriage would undermine the importance of fathers—a change that would likely, over time, result in less fathers marrying their children's mothers and jointly raising the children they beget. *Id.* at 74-75; *see also* Hawkins Br. at 16-28. That no-fault divorce has already contributed to a breakdown of marriages does not mean that the State must restructure the marital relation in a manner that is likely to produce additional adverse effects.

Plaintiffs' continued insistence that same-sex couples parent as well as opposite-sex couples once again misses the mark. Aplee.Br.57. After all, the most far-reaching negative consequence of redefining marriage is that a genderless-marriage regime would communicate messages about marriage that, over time, would result in fewer man-woman couples marrying when they have or raise children and fewer man-woman couples remaining married throughout their children's upbringing. *See* Aplt.Br.72-82; George Br. at 14-20; Hawkins Br. at 16-28. All this would lead to more broken homes, and as even Plaintiffs admit, a lack of "stability in the relationship between two parents" is bad for children. Aplee.Br.58. Thus, retaining the man-woman marriage institution is sound and constitutional social policy even if Plaintiffs claims about same-sex parenting are true.

But it is reasonable to question, as many have, Plaintiffs' claims about same-sex parenting. *See Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 825 (11th Cir. 2004); Professors of Social Science Amicus Br. at 2-3 ("Professors of Social Science Br."). Indeed, Plaintiffs and their amici bear a heavy burden here, because longstanding research has shown that "the ideal environment for raising children is a stable biological mother and father." Professors of Social Science Br. at 3. "Therefore, a claim that another parenting structure provides the same level of benefit should be rigorously tested and based on sound

methodologies and representative samples." *Id.* But the studies that Plaintiffs and their amici rely on exhibit significant analytical shortcomings, such as the use of small, non-random, non-representative samples. *See id.* at 12-20. These studies are thus insufficient to overcome the time-tested research demonstrating that the optimal childrearing environment is a stable home headed by a child's own mother and father, *see* Aplt.Br.50-51, or to displace the centuries-old legal presumption in favor of natural parents. *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979); 1 William Blackstone, Commentaries *435 (Aplt.App.334).

### D. Plaintiffs Have Not Shown that Heightened Scrutiny Applies to Their Claims.

#### 1. Heightened Scrutiny is Not Called for by *Romer*, *Lawrence*, or *Windsor*.

Plaintiffs assert that "*Romer*, *Lawrence*, and *Windsor* point the way toward heightened scrutiny" for all laws that disparately impact same-sex couples. Aplee.Br.32. This argument falters at the outset, however, because none of those cases applied heightened scrutiny. This Court has already recognized that *Romer* "us[ed] [the] rational basis test," *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008), and that *Lawrence*, a case not decided on equal-protection grounds, "applied rational basis review to the law" at issue there. *Seegmiller v. LaVerkin City*, 528 F.3d 762, 771 (10th Cir. 2008) (further stating that "the Court

resolved the constitutionality of Texas's sodomy law in *Lawrence* by applying the rational basis test, rather than heightened scrutiny"); *Lofton*, 358 F.3d at 817.

Nor did *Windsor* apply heightened scrutiny. The Court there reviewed a Second Circuit decision that expressly adopted heightened scrutiny. *See Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013). And the parties defending the Second Circuit decision before the Supreme Court urged the Court to embrace that standard. *See* Brief on the Merits for Respondent at 17-32, *United States v. Windsor*, 133 S. Ct. 2675 (2013) (No. 12-307); Brief for the United States on the Merits Question at 18-36, *United States v. Windsor*, 133 S. Ct. 2675 (2013) (No. 12-307). Yet the Court nowhere stated that it adopted that standard.

Plaintiffs suggest that *Windsor* applied heightened scrutiny, rather than rational-basis review, because the Court did not evaluate the marriage-related interests that Congress raised in defense of DOMA. Aplee.Br.34-35. But as *Windsor* itself recognized, the federal government has "no authority . . . on the subject of marriage." 133 S. Ct. at 2691 (quotation marks omitted). Thus, when Congress raised those marriage-related interests, they were not legitimate because they fell outside Congress's authority, and the Court, therefore, did not need to consider them.

In addition to the fact that *Romer*, *Lawrence*, and *Windsor* did not apply heightened scrutiny, Plaintiffs' categorical claim that those cases established a new standard for all laws that disparately impact same-sex couples is unjustified. As *Windsor* makes clear, it is "'[d]iscrimination[] of an unusual character,'" not any law that might disparately impact same-sex couples, that "require[s] careful consideration." *Id.* at 2693. Context matters, and here context confirms that nothing unusual is afoot, for the Marriage Amendment is not a novel departure from settled law, but a reaffirmation of it. Aplt.Br.31-32.[4]

The importance of context, as stressed in *Windsor*, thus demonstrates that the categorical rule adopted by the Ninth Circuit in *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014), is unsupportable. Evincing that court's own doubts about *SmithKline Beecham*'s analysis, on March 27, 2014, the Ninth Circuit *sua sponte* called for briefing on "whether the case should be reheard en banc." Order, *SmithKline Beecham Corp. v. Abbott Labs.*, No. 11-17357 (9th Cir. Mar. 27, 2014).

Rather than adopting the categorical rule proposed by Plaintiffs, this Court should compare this case to the particular facts in *Romer*, *Lawrence*, and *Windsor*, and conclude that none of those decisions governs here. To begin with, three

---

[4] It is not unusual for a State to regulate or define marriage in its constitution. In fact, since Oklahoma's inception, its state constitution has established that "[p]olygamous or plural marriages are forever prohibited." Okla. Const. art. I, § 2.

substantial differences separate this case from *Romer v. Evans*, 517 U.S. 620 (1996), where Colorado through Amendment 2 imposed a "[s]weeping" and "unprecedented" political disability on all individuals identified "by a single trait." *Id.* at 627, 633.

First, the definition of marriage affirmed here is not "unprecedented in our jurisprudence" or alien to "our constitutional tradition." *Id.* at 633. In fact, it is difficult to think of a legal principle with deeper roots in Oklahoma's and our Nation's history, practices, and traditions than marriage as the union of a man and a woman—a legal principle that continues to prevail in Oklahoma law and in the majority of States, most of which have enacted their own constitutional provisions similar to the Marriage Amendment.

Second, far from imposing a "broad and undifferentiated disability on a single named group" or denying that group "protection across the board," *id.* at 632-33, the Marriage Amendment's purpose was specific and particularized—to affirm marriage as a gendered institution. Many courts, including the Eighth Circuit, have thus rejected attempts to compare a constitutional amendment affirming man-woman marriage to the sweeping measure struck down in *Romer*. *See Bruning*, 455 F.3d at 868 (rejecting the argument "that the Colorado enactment at issue in *Romer* is indistinguishable" from a constitutional amendment defining marriage as the union of a man and a woman); *Strauss v. Horton*, 207 P.3d 48, 102

(Cal. 2009) (distinguishing a constitutional amendment affirming man-woman marriage from the Colorado amendment's effect of leaving "a group vulnerable to public or private discrimination in *all* areas without legal recourse").

Third, although Amendment 2 was bereft of any conceivable legitimate state purpose and thus could be explained only as resulting from "a bare . . . desire to harm a politically unpopular group," *Romer*, 517 U.S. at 634, the Marriage Amendment is supported by a number of compelling government interests. *See* Aplt.Br.46-55. Moreover, the gendered definition of marriage has prevailed in virtually all societies throughout human history not because of animus against same-sex couples, but because marriage is closely connected to society's vital interests in the uniquely procreative nature of man-woman relationships. *See id.* at 23-28; *Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006) ("[T]he traditional definition of marriage is not merely a by-product of historical injustice. Its history is of a different kind.").

Nor is this case like *Lawrence v. Texas*, 539 U.S. 558 (2003), where the State punished *as a crime* "the most private human conduct, sexual behavior, and in the most private of places, the home," or sought "to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." *Id*. at 567. By reaffirming man-woman marriage, Oklahomans have not interfered with, let

alone criminalized, any private behavior or personal relationship. Rather, they have simply reserved a special form of recognition and support to those relationships that uniquely further vital social interests. The State's right to do just that is directly supported by the Supreme Court's repeated acknowledgement that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity." *Maher v. Roe*, 432 U.S. 464, 475 (1977); *see also Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2989 n.17 (2010) (emphasizing "the distinction between state prohibition and state support").

As New York's highest court explained in a case similar to this one, "Plaintiffs here do not, as the petitioners in *Lawrence* did, seek protection against state intrusion on intimate, private activity. They seek from the courts access to a state-conferred benefit that the Legislature has rationally limited to opposite-sex couples." *Hernandez*, 855 N.E.2d at 10. Thus, contrary to Plaintiffs' assertion, Smith has not "repeat[ed] the *Bowers v. Hardwick* 'failure to appreciate the extent of the liberty at stake,'" Aplee.Br.26 (quoting *Lawrence*, 539 U.S. at 567), because the interest implicated here (official government recognition of relationships) is vastly different than the interest at stake in *Bowers* and *Lawrence* (criminal punishment of private conduct and relationships).

Finally, as established in Smith's opening brief, this case is not comparable to *Windsor*. Aplt.Br.28-32. Thus, *Romer*, *Lawrence*, and *Windsor*, when read together or in isolation, do not control here.

> ### 2.    Neither the Purpose Nor Effect of the Marriage Amendment Requires Heightened Scrutiny.

Plaintiffs argue that this Court should apply heightened scrutiny because "moral disapproval of same-sex marriage" was the "justification" for the Marriage Amendment. Aplee.Br.46. Plaintiffs and their amici support this audacious claim with a *few* articles referencing a *handful* of comments by *three* of the 130 legislators who approved the Amendment. *See id.* at 46-47; Anti-Defamation League Amicus Br. at 10-12 ("Anti-Defamation League Br."); *see also* Aplt.App.264-67 (indicating that 130 legislators voted for the Marriage Amendment). But their attempts to establish this bold charge have failed.

As an initial matter, reliance on isolated public statements from individual supporters is improper under Supreme Court precedent, a point that Smith established in the opening brief. Aplt.Br.33-35. Rather than responding to those arguments, Plaintiffs cite three cases that they believe justify a court in consulting such statements: *Finstuen v. Crutcher*, 496 F.3d 1139, 1148 n.6 (10th Cir. 2007); *Atlantic Refining Co. v. Oklahoma Tax Commission*, 360 P.2d 826, 827 (Okla. 1959); and *North v. McMahan*, 110 P. 1115, 1115 (Okla. 1910). *See* Aplee.Br.47 n.28. But although those cases considered the general "history of the time," *Atl.*

*Ref. Co.*, 360 P.2d at 827, and a press release issued by the entire legislative body, *see Finstuen*, 496 F.3d at 1148 n.6, none of them cited isolated statements by individual legislators or supporters.

Furthermore, invoking a handful of individual statements in the public domain as a basis for invalidating a voter-approved constitutional provision would be utterly unworkable. It is indeed absurd to suggest that a few articles quoting three legislators establish the motives of more than 130 legislators and a million voters. Additionally, adopting such analysis would incongruously permit courts to uphold the marriage law of one State while striking down an identically worded law in another State simply because the tenor of the public debate varied between the jurisdictions. *Cf. Palmer v. Thompson*, 403 U.S. 217, 225 (1971) ("If the law is struck down for this reason [because of supporters' motives] . . . , it would presumably be valid as soon as the . . . relevant governing body repassed it for different reasons."); *see also* Indiana Br. at 13. Such analysis does not form the basis of sound jurisprudence.[5]

---

[5] More fundamentally, attempting to discern the motivations for a voter-enacted measure using sources other than the law's plain language and objective effect is futile. Multiple circuits, when analyzing equal-protection claims, have discussed the difficulty and impropriety of attempting to decipher what motivated the citizens who approved a voter-enacted law. The Sixth Circuit, for example, stated that one of the reasons it has "'limit[ed] a court's examination of the factors motivating the electorate in a referendum election'" is "the difficulty of 'ascertaining what motivated the [voters].'" *Clarke v. City of Cincinnati*, 40 F.3d 807, 815 (6th Cir. 1994) (quoting *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 573-75 (6th Cir.

In any event, none of the statements cited by the District Court, Plaintiffs, or their amici evince animus. In fact, State Senator James Williamson, the primary target of Plaintiffs' and the District Court's accusations, repeatedly disclaimed any animus against gays and lesbians. *See* Brian Barber, *Ban on gay marriage debated*, Tulsa World, Oct. 13, 2004 (Aplt.App.158) ("This is not meant to be an attack on the gay community . . . . 'This is meant to protect traditional marriage as the foundation of our society.'"); Robert Evatt, *Local 'Pro-Marriage Rally' takes aim at same-sex unions*, Aug. 25, 2004 (Aplt.App.160) ("As Christians, we are called to love homosexuals.").[6] And many of the large religious organizations that support the man-woman marriage institution have attested that their views and beliefs about marriage are rooted not in animus, but in concern for the welfare of children and society. *See* United States Conference of Catholic Bishops Amicus Br. at 5-20. Even putting aside the issue of animus, Plaintiffs are wrong to suggest

---

1986)). Similarly, the Ninth Circuit observed that divining "the true motive" of the voters on a topic that implicates "many environmental and social values" would require "a probing of the private attitudes of the voters," which "would entail an intolerable invasion of . . . privacy." *S. Alameda Spanish Speaking Org. v. City of Union City, Cal.*, 424 F.2d 291, 295 (9th Cir. 1970).

[6] Plaintiffs and their amici misleadingly portray some of the materials that they reference. For instance, they discuss a "pro-marriage rally" organized by over 40 churches, implying that the primary impetus for the event was to promote the Marriage Amendment. Aplee.Br.46; Anti-Defamation League Br. at 11. Yet the focus of the rally, as reflected by the topic that the keynote speaker addressed, was not the Marriage Amendment, but practical "faith-based ways of building better marriages." Evatt, *supra*, at 1 (Aplt.App.160).

that a law is constitutionally suspect for the sole reason that a few of its supporters expressed religious or moral views during public discussions preceding the law's enactment. *See id.* at 29-35.

Plaintiffs, in the end, have failed in their attempt to portray the Marriage Amendment as little more than a religiously inspired law. Tellingly, a poll of Oklahoma voters conducted less than a month before the 2004 election showed that the Marriage Amendment was "*favored* by those who *don't* attend religious services by a 51 percent to 48 percent margin." Ray Carter, *Marriage question among most popular on state ballot*, Journal Record, Oct. 12, 2004 (emphasis added). And even among voters who regularly attend religious services, many of them avidly support redefining marriage, as Plaintiffs' amici attest. *See* Episcopal Diocese of Utah Amicus Br. at 1-7, 17-24 ("[I]t would be a mistake to elevate any one view on marriage above all others as the 'Christian' or 'religious' view."); Anti-Defamation League Br. at 18-20 (observing that a significant "number of religious groups and individuals support" redefining marriage); *see also* Concerned Women for America Amicus Br. at 31-33 ("Concerned Women for America Br.") (filed in *Kitchen v. Herbert* in support of the government officials defending the challenged marriage laws).

Seeking once more to analogize this case to *Windsor*, Plaintiffs argue that the Marriage Amendment's title ("the Marriage Protection Act") suggests an

29

improper motive. Aplee.Br.47-48. But yet again, this attempted parallel overlooks a critical distinction between DOMA and the Marriage Amendment. In *Windsor*, the federal government, which lacks "authority . . . on the subject of marriage," *Windsor*, 133 S. Ct. at 2691 (quotation marks omitted), had no legitimate interest in defending the man-woman marriage institution preserved throughout the majority of States. In contrast, here, the State of Oklahoma, which has "essential authority to define the marital relation," *id.* at 2692, furthers legitimate and compelling interests when it protects the institution of marriage from a fundamental redefinition that risks adverse social consequences. Thus, while the title of DOMA disclosed an improper motive in *Windsor*, no such parallel can be drawn here. If anything, the Marriage Amendment's title underscores the State's institutional concerns about marriage and its redefinition.

Unable to tar the People's motives, Plaintiffs resort to mischaracterizing Smith's arguments, claiming that Smith has reduced the purpose of the Marriage Amendment to the "merely *procedural*" goal of preventing state-court judges from redefining marriage. Aplee.Br.48-49. But Smith has already explained that the Marriage Amendment achieves multiple purposes. First, the Amendment's immediate "purpose, as reflected in its plain language and determined by its objective effect, is to ensure that the state judiciary cannot change the definition of marriage that has always existed in Oklahoma law." Aplt.Br.33. Second, by

preserving the status quo, the Amendment affirms the man-woman marriage institution's "longstanding public purpose of channeling the presumptive procreative potential of man-woman relationships into committed unions for the benefit of children and society." *Id.* Third, "[t]he interests that the State furthers through this channeling function are at least threefold: (1) providing stability to the types of relationships that result in unplanned pregnancies and thereby avoiding or diminishing the negative outcomes often associated with unintended children; (2) encouraging the rearing of children by both their mother and their father; and (3) encouraging men to commit to the mothers of their children and jointly raise the children they beget." *Id.* at 46-47. Because the Marriage Amendment furthers all these legitimate and compelling ends, it easily satisfies constitutional review. *See Bruning*, 455 F.3d at 867-69 (concluding that "the reinforcing effect" of a state constitutional provision that elevates the State's definition of marriage from its statutes to its constitution satisfies rational-basis review).

Turning from the purpose to the effect of the Marriage Amendment, Plaintiffs contend that the Amendment's effect is impermissible. Aplee.Br.44-45. But Plaintiffs' attempt to mirror *Windsor*'s discussion of DOMA's effects is unavailing. *Windsor*, after all, "confined" its equal-protection analysis and "its holding" to the federal government's treatment of couples "who are joined in same-sex marriages made lawful by the State." 133 S. Ct. at 2695-96. *Windsor* thus

31

consistently tied its discussion of DOMA's effects to the unusual circumstance that the federal government interfered with a status that New York bestowed on same-sex couples. *See id.* at 2696 ("[DOMA] refus[ed] to acknowledge a status the State finds to be dignified and proper"); *id.* ("[DOMA's] purpose and effect [is] to disparage and to injure those whom the State, by its marriage laws, sought to protect"). Here, however, the State of Oklahoma has not reached into another State and affected the marital status of its citizens. It has merely retained the man-woman marriage institution within its borders.

Additionally, DOMA's effect on same-sex couples was entirely gratuitous and unwarranted because it resulted from the federal government's meddling with a topic, the definition of marriage, over which it had no authority. *See id.* at 2691. Here, in contrast, the Marriage Amendment's effect on same-sex couples is the incidental result of the State's exercising its essential authority to maintain the man-woman marriage institution and thereby preserve marriage's efficacy in accomplishing the procreative and child-related interests it has always served. In other words, while the federal government had no legitimate interest in enacting DOMA, the State (as demonstrated) has legitimate and compelling reasons for affirming the man-woman marriage institution.

**3.**  **Binding Precedent of this Court Establishes that Sexual-Orientation-Based Equal-Protection Claims Do Not Apply Heightened Scrutiny.**

This Court has already held that sexual-orientation-based equal-protection claims are subject to rational-basis review. *Price-Cornelison*, 524 F.3d at 1113-14 & n.9. Plaintiffs, however, argue that "this Court's precedents do not . . . limit review of sexual orientation discrimination to rational basis." Aplee.Br.36 (capitalization omitted). Yet their admitted attempt to change long-established law in this Circuit (*see id.* at 41 (admitting that "this Court has yet to" apply heightened scrutiny to sexual-orientation-based equal-protection claims)) is unpersuasive.

As an initial matter, this Court need not even consider the proper standard of review to apply to sexual-orientation-based equal-protection claims. Unlike laws that explicitly classify individuals based on sexual orientation, the Marriage Amendment implicates sexual orientation only to the extent that it distinguishes between same-sex couples and opposite-sex couples[7]—a distinction that reflects biological realities closely related to society's enduring interest in marriage. *See* Aplt.Br.23-28. To resolve this case, then, this Court need hold only that, in the context of marriage laws, the biologically based, plainly relevant distinction between same-sex couples and opposite-sex couples calls for nothing more than rational-basis review. *See id.* at 44-45 (discussing *City of Cleburne v. Cleburne*

---

[7] Plaintiffs admit that "the line" drawn by the Marriage Amendment "is certainly couple-based." Aplee.Br.32 (quotation marks omitted).

*Living Ctr., Inc.*, 473 U.S. 432, 441-42 (1985), and *Hernandez*, 855 N.E.2d at 11); *Bruning*, 455 F.3d at 866-67 ("[R]ational-basis review applies 'where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement'" (quoting *Cleburne*, 473 U.S. at 441)).

Nonetheless, binding case law in this Circuit forecloses heightened scrutiny of sexual-orientation-based equal-protection claims. In *Price-Cornelison*, for example, this Court held that the plaintiff's sexual-orientation-based equal-protection claim did not "implicate a protected class, which would warrant heightened scrutiny," and thus that "[a] government official can . . . distinguish between its citizens on the basis of sexual orientation, if that classification bears a rational relation to some legitimate end." 524 F.3d at 1113-14 (footnote and quotation marks omitted).

Plaintiffs suggest that the Court should ignore *Price-Cornelison* because that decision "misread" this Court's precedent. Aplee.Br.23; *see also id.* at 37-38. Yet *Price-Cornelison* did not misread, but faithfully applied, this Court's repeated conclusion that classifications based on sexual orientation are subject to rational-basis review. *See, e.g.*, *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 854 (10th Cir. 1995) (citing *Jantz v. Muci*, 976 F.2d 623, 630 (10th Cir. 1992), for the "holding that classifications which disparately affect homosexuals require rational basis

review").[8] In addition, *Price-Cornelison* did not rely solely on this Court's case law; rather, it expressly invoked widespread authority, including *Romer* and case law from nine other circuits, to support its decision to apply rational-basis review. *See Price-Cornelison*, 524 F.3d at 1113 n.9.

In urging this Court to ignore its precedent, Plaintiffs raise two other unpersuasive observations. First, they assert that after 1984 (the year that this Court decided *Rich* and *National Gay Task Force v. Board of Education of City of Oklahoma City*, 729 F.2d 1270, 1273 (10th Cir. 1984)) "the Supreme Court subsequently determined that gender classifications are quasi-suspect." Aplee.Br.38. But as Plaintiffs' own brief later recognizes, the Supreme Court made this determination in 1976 (not after 1984). *Id.* (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976)). Second, Plaintiffs discuss the impact of *Lawrence*'s overruling of *Bowers*. Aplee.Br.38. But *Price-Cornelison* was decided five years after *Lawrence*, and it cited four other circuit-court decisions decided after *Lawrence*. *See Price-Cornelison*, 524 F.3d at 1113 n.9. Additionally, this Circuit's pre-*Lawrence* case law establishing the appropriate standard of review for sexual-orientation-based equal-protection claims did not rely on *Bowers*. *See, e.g.,*

---

[8] *See also Rich v. Sec'y of the Army*, 735 F.2d 1220, 1229 (10th Cir. 1984) (holding that "[a] classification based on one's choice of sexual partners is not suspect," and citing as support *DeSantis v. Pac. Tel. & Tel. Co., Inc.*, 608 F.2d 327, 333 (9th Cir. 1979), which observed that "courts have not designated homosexuals a 'suspect' or 'quasi-suspect' classification").

*Walmer*, 52 F.3d at 854; *Rich*, 735 F.2d at 1229; *National Gay Task Force*, 729 F.2d at 1273.[9]

Although this standard-of-review question is already foreclosed, if this Court were to reconsider its past case law on this issue, it should reaffirm that sexual orientation is not a suspect or quasi-suspect classification. A significant factor in that analysis is whether the "political processes ordinarily to be relied upon to protect" the group seeking a suspect or quasi-suspect designation has been "curtail[ed]." *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938). In assessing that factor, the relevant question is whether the class at issue is "politically powerless in the sense that [its members] have no ability to attract the attention of the lawmakers." *Cleburne*, 473 U.S. at 445. Here, however, it cannot be seriously questioned that gays and lesbians possess abundant political power and undoubtedly attract lawmakers' attention. *See* Concerned Women for America Br. at 6-35 (filed in *Kitchen v. Herbert*). To cite just one relevant example, in 2012, the citizens in three States—Maine, Maryland, and Washington—redefined marriage through a direct vote of a majority of the electorate. *See* Richard

---

[9] Plaintiffs also claim that *Price-Cornelison* has been "supersed[ed]" by "*Romer*, *Lawrence*, and *Windsor*." Aplee.Br.24; *see also id.* at 36-37. But *Price-Cornelison* post-dated *Romer* and *Lawrence*, and expressly relied on *Romer* to support its holding that rational basis is the proper standard of review. *See Price-Cornelison*, 524 F.3d at 1113 n.9. Moreover, as explained above, *Windsor*'s contextual approach, with its focus on "unusual[ness]," does not reverse *Price-Cornelison*'s pronouncement on the appropriate standard of review for sexual-orientation-based equal-protection claims. *See supra* at 22.

Socarides, *Obama and Gay Marriage: One Year Later*, The New Yorker, May 6, 2013, *available at* http://www.newyorker.com/online/blogs/newsdesk/2013/05/ obama-and-gay-marriage-one-year-later.html.

Plaintiffs, moreover, are also unable to establish the immutability requirement. Under Supreme Court case law, an immutable characteristic is one "determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973); *see also Quiban v. Veterans Admin.*, 928 F.2d 1154, 1160 n.13 (D.C. Cir. 1991) (Ginsburg, J.). Yet according to the American Psychiatric Association, "there are no replicated scientific studies supporting any specific biological etiology for homosexuality." American Psychiatric Association, *LGBT-Sexual Orientation*, http://psychiatry.org/mental-health/people/lgbt-sexual-orientation (last visited Apr. 1, 2014); *see also* Dr. Paul McHugh Amicus Br. at 15-27 ("McHugh Br."). Furthermore, sexual orientation is a complex and amorphous phenomenon that defies consistent definition, and thus it is not a distinguishing characteristic of a discrete group. *See* McHugh Br. at 3-14.

It is thus no wonder that nearly every circuit that has addressed this question, including this Court, has held that sexual orientation is not a suspect or quasi-suspect classification. *See Price-Cornelison*, 524 F.3d at 1113 n.9 (citing cases from ten circuits). This nearly uniform circuit consensus is consistent with the

Supreme Court's recent decision in *Windsor* not to adopt the Second Circuit's conclusion that sexual orientation is a quasi-suspect classification.

> **4.    The Marriage Amendment Does Not Impermissibly Discriminate on the Basis of Sex, and Thus Heightened Scrutiny Does Not Apply.**

The District Court correctly concluded that the Marriage Amendment does not impermissibly discriminate on the basis of sex because it "does not draw any distinctions between same-sex male couples and same-sex female couples, does not place any disproportionate burdens on men and women, and does not draw upon stereotypes applicable only to male or female couples." Aplt.App.672 (Op. at 49). On appeal, Plaintiffs contest this conclusion, arguing that the Amendment unconstitutionally discriminates on the basis of sex. Aplee.Br.41-43. Plaintiffs primarily rely on *Loving*, a race-discrimination case, to advance their claim of unlawful sex discrimination. *Id.* at 42-43. But as Smith explained in the opening brief (a point that Plaintiffs do not attempt to refute), race and sex are not treated the same under equal-protection analysis. *See* Aplt.Br.42-43. *Loving* thus does not advance Plaintiffs' sex-discrimination argument.

Plaintiffs, at bottom, have not satisfied the threshold inquiry for their sex-discrimination claim because they have not shown that the Marriage Amendment subjects men or women as a class to disparate treatment, or that the Amendment purposefully discriminates against men or women. *See id.* at 41-42. Hence, the

intermediate-scrutiny standard that governs sex-discrimination claims does not apply here.

### 5. Plaintiffs' Claims Do Not Implicate a Fundamental Right, and Thus Heightened Scrutiny Does Not Apply.

The fundamental right to marry—that is, the right to enter the relationship of husband and wife—is not at issue in this case. Instead, Plaintiffs, in asserting a constitutional right to marry a person of the same sex, seek a new right that lacks any support in the history and tradition of our Nation.

Relying on *Lawrence*, Plaintiffs disclaim the preeminence of history in fundamental-rights analysis. Aplee.Br.65. But the Supreme Court in cases decided after *Lawrence* continues to ask whether an asserted "right is 'deeply rooted in this Nation's history and tradition'" when assessing whether it "is fundamental to *our* scheme of ordered liberty." *McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3036 (2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *see also Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 72 (2009) (rejecting an asserted substantive-due-process right because there was "no long history of such a right"). This Court too continues to apply that history-focused analysis. *See Seegmiller*, 528 F.3d at 769-70 (decided in 2008).

Given the centrality of history in this analysis, Plaintiffs' *Windsor*-compelled admission that "the possibility of same-sex couples marrying had not occurred to many 'until recently'" dooms their fundamental-rights argument.

39

Aplee.Br.65 (quoting *Windsor*, 133 S. Ct. at 2689). Indeed, Plaintiffs premise their fundamental-rights claim on the fact that some in society now believe that marriage should be redefined to include same-sex couples. Aplee.Br.65 (discussing the "new insight" of some about the definition of marriage (quoting *Windsor*, 133 S. Ct. at 2689)). But novel ideas and modern legal experiments do not create or otherwise form the basis of a fundamental constitutional right. *See Reno v. Flores*, 507 U.S. 292, 303 (1993) ("The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it").

Continuing with their emphasis on *Lawrence*, Plaintiffs boldly assert that *Lawrence* removed "any doubt" that the deeply rooted fundamental right to marry includes the right to marry a person of the same sex. Aplee.Br.66-67. But *Lawrence* expressly stated that it did "not involve," and thus did not decide, "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." 539 U.S. at 578. That disclaimer thus refutes Plaintiffs' far-reaching claims about *Lawrence*.

Refusing to accept that the carefully described right raised by Plaintiffs is the right to marry a person of the same sex, *see Glucksberg*, 521 U.S. at 721, Plaintiffs argue that the Supreme Court has not specifically characterized the fundamental right to marry to account for the particularized circumstances of its prior cases (by, for example, speaking of a "right to interracial marriage" in *Loving*

or a "right to inmate marriage" in *Turner v. Safley*, 482 U.S. 78 (1987)). Aplee.Br.66. But this argument ignores that the right to marry recognized by the Supreme Court, like all fundamental rights affirmed by that Court, is a right with objective meaning and contours. Indeed, the only recognized definition of marriage from the founding of our county until a decade ago was the union of a man and a woman. *See, e.g.*, Noah Webster, *An American Dictionary of the English Language* (1st ed. 1828) (Aplt.App.338) (defining marriage as the "union of a man and woman"); Black's Law Dictionary 992 (8th ed. 2004) (defining marriage as "[t]he legal union of a couple as husband and wife"). Because all of the Supreme Court's fundamental-right-to-marry cases involved unions that fell within that unquestioned definition, the Court never before needed to describe the right as anything other than the right to marry. Plaintiffs here, however, seek not to partake in, but to redefine, that deeply rooted constitutional right. This Court should thus reject Plaintiffs' attempt to circumvent *Glucksberg*'s careful-description command by offering a repackaged version of the fundamental right to marry. It is not enough to dress a new right in the garb of an old one.

Plaintiffs also suggest that *Loving*'s invalidation of miscegenation laws supports their fundamental-rights argument. *See* Aplee.Br.66 (citing a brief that compares this case to cases addressing "bans on interracial marriage"). But the history of man-woman marriage differs dramatically from the history of

miscegenation laws. Indeed, the man-woman definition of marriage, which is rooted in the common law, *universally* prevailed in our country until a decade ago. In contrast, miscegenation laws were never universal; they were unknown at common law, in six of the 13 colonies, and in many other States. *See* Irving G. Tragen, *Statutory Prohibitions against Interracial Marriage*, 32 Cal. L. Rev. 269, 269 & n.2 (1944) ("[A]t common law there was no ban on interracial marriage."); Lynn Wardle and Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 How. L.J. 117, 180-81 (2007) (providing a state-by-state description of miscegenation laws); *see also* Scholars of History Br. at 19-21; Center for Constitutional Jurisprudence Amicus Br. at 27-28 ("Center for Constitutional Jurisprudence Br.").

Moreover, the man-woman core of marriage has historically been its defining characteristic, while racial restrictions were never understood to be definitional. *See supra* at 41 (citing dictionaries). As stated by a leading treatise author on the law of marriage writing close to the time of the Fourteenth Amendment's enactment, "[m]arriage between two persons of one sex could have no validity, as none of the ends of matrimony could be accomplished thereby. It has *always*, therefore, been deemed requisite to the *entire* validity of *every* marriage . . . that the parties should be of different sex." Bishop, *supra*, at § 225 (Aplt.App.313) (emphasis added). That author, by contrast, acknowledged that

racial restrictions were never a defining feature of marriage; they were "impediments, which [were] known only in particular countries[] or States." *Id.* at § 213.

Furthermore, while the man-woman definition of marriage is inescapably connected to the institution's central purpose of steering potentially procreative relationships into committed unions, miscegenation laws were at war with that purposes. By prohibiting interracial marriages, those laws decreased the likelihood that children of mixed-race couples would be born to and raised by their mother and father in stable and enduring family units. It is thus not surprising that the Supreme Court in *Loving* held that those laws violated the fundamental right to marry.

Because man-woman marriage laws and miscegenation laws are worlds apart, *Windsor*'s unremarkable observation that "[s]tate laws defining and regulating marriage . . . must respect the constitutional rights of persons," 133 S. Ct. 2691, followed by a citation to *Loving*, is not (as Plaintiffs and the District Court assert) "a disclaimer of enormous proportion." Aplee.Br.63 (quoting Aplt.App.660 (Op. at 37)). Rather, the citation to a readily distinguishable case like *Loving* underscores that Oklahoma has not contravened any of the "constitutional rights" that constrain the State's broad authority to regulate marriage.

In short, Plaintiffs' effort to expand the Supreme Court's fundamental-rights jurisprudence is unsustainable. Their argument flies directly in the face of the Court's consistent "'reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Osborne*, 557 U.S. at 72 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)); *see generally* Center for Constitutional Jurisprudence Br. at 5-30. This Court should thus hold that Plaintiffs' claims do not implicate a fundamental right and thereby permit the People to "shap[e] the destiny of their own times" concerning the definition of marriage. *Windsor*, 133 S. Ct. at 2692 (quotation marks omitted); *see also Glucksberg*, 521 U.S. at 720 (noting that the improvident expansion of substantive due process "to a great extent, place[s] the matter outside the arena of public debate and legislative action").

## III. Plaintiffs Cannot Satisfy the Causation or Redressability Requirement of Standing for Any of their Claims.

Plaintiffs' decision to challenge only the Marriage Amendment and not the marriage statutes—a decision in marked contrast to virtually all other plaintiffs pressing these claims nationwide—has left them unable to satisfy the causation or redresssability requirements of standing. Aplt.Br.86-88.[10] The arguments raised in Plaintiffs' brief have not remedied their standing deficiencies.

---

[10] "The question of standing is not subject to waiver" because all federal courts have an independent obligation to address that issue. *United States v. Hays*, 515

Relying on *Fent v. Henry*, 257 P.3d 984 (Okla. 2011), Plaintiffs claim that the Marriage Amendment has subsumed the marriage statutes and rendered them nugatory. Aplee.Br.76. But *Fent* expressly established the opposite—that "repeals by implication are never favored," that "it is not presumed that the legislature, in the enactment of a subsequent statute intended to repeal an earlier one, unless it has done so in express terms," and that "all provisions must be given effect unless irreconcilable conflicts exist." 257 P.3d at 991. Here, of course, nothing suggests that the Marriage Amendment was intended to revise or repeal the marriage statutes; it confirms, rather than conflicts with, those statutes. Thus, under Oklahoma law, the unchallenged marriage statutes have not been displaced or otherwise erased from the code.[11]

Plaintiffs' assertion that "statutes die in the books the moment their analogues have been declared invalid" overlooks, rather than answers, the standing question raised here. Aplee.Br.77. Because, as Smith has demonstrated, Plaintiffs

---

U.S. 737, 742 (1995); *see also New England Health Care Employees Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008) ("[A]ny party, including the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation, including on appeal").

[11] Plaintiffs' citation to *Hendrick v. Walters*, 865 P.2d 1232, 1240 (Okla. 1993), is similarly unavailing. Aplee.Br.76. *Hendrick* involved a clear "intent to abrogate" by constitutional amendment an earlier statutory law prescribing a particular oath for public officials. 865 P.2d at 1241. But no such intent to repeal the marriage statutes appears here.

lack standing, they are not entitled to a judicial declaration on the Marriage Amendment's constitutionality. The predicate for Plaintiffs' argument (a judicial declaration on the Marriage Amendment's constitutionality) thus assumes the answer to the very standing question presented here. Moreover, Plaintiffs' legal theories, which focus on the motivations of lawmakers, undermine their assumption that the statutes would necessarily fall if the constitutional provision does. *See id.* at 44-49. If this Court adopts that motives-based analysis (which, as explained above, it should not), it stands to reason that the motivations of the legislators who enacted Oklahoma's first marriage laws more than a century ago, *see* Aplt.Br.5, might pass constitutional muster, notwithstanding the Court's resolution of the pending challenge to the Marriage Amendment.

Also meritless is Plaintiffs' claim that they have standing because an injunction against the Marriage Amendment's enforcement would remedy the "injury of shutting the state courthouse doors on Plaintiffs." Aplee.Br.78. First, the Marriage Amendment did not close state courts to Plaintiffs; they are free to bring their claims in state court at any time. Second, Plaintiffs have not alleged in their complaint or in any other filing that the injury they seek to vindicate is a lack of access to state courts. Rather, they have consistently sought to obtain a marriage license or recognition of an out-of-state marriage license. Aplt.App.041-42. For all these reasons, Plaintiffs have not established standing to pursue their claims.

## IV.    Plaintiffs Barton and Phillips Cannot Prevail on their Recognition Claim.

### A.    Plaintiffs Barton and Phillips Lack Standing to Bring their Recognition Claim against Smith.

The District Court appropriately concluded that Plaintiffs Barton and Phillips lack standing to bring their recognition claim—that is, their challenge to Part B of the Marriage Amendment (the recognition provision)—against Smith. Aplt.App.651 (Op. at 28). The causation requirement of standing is not satisfied where Plaintiffs fail to show that their injury is "fairly traceable to the challenged *action of the defendant*[.]" *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007) (quotation marks omitted). Similarly, "[t]he redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Id.* at 1111. Plaintiffs Barton and Phillips cannot satisfy the causation or redressability requirements here, because although Smith issues and records marriage licenses in Oklahoma, she has "'no authority to recognize or record a marriage license issued by another state[.]'" Aplt.App.650 (Op. at 27) (quoting Smith's Affidavit at ¶ 5 (Aplt.App.248)); *see also* Okla. Stat. tit. 43, § 5 (listing the duties of the clerk without mentioning any authority to recognize out-of-state marriages). Tellingly, Plaintiffs' own actions, as alleged in their complaint, show that they understood this: while "Plaintiffs Bishop and Baldwin sought the

issuance of a marriage license" from Smith, Plaintiffs Barton and Phillips never asked Smith to recognize their California marriage license. Aplt.App.036.

Plaintiffs do not cite any Oklahoma law indicating that Smith recognizes out-of-state marriages as part of her official duties. Instead, they rely only on an ambiguous clause from this Court's prior decision in this case stating that "'recognition of marriage is within the administration of the judiciary.'" Aplee.Br.74 (quoting *Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009) (unpublished)). But as the District Court observed below, "the statutes cited in [that decision] do not reference court clerks' authority to 'recognize' an out-of-state marriage." Aplt.App.650 (Op. at 27). That opinion thus does not provide support for Plaintiffs' baseless claim that Oklahoma law authorizes Smith to recognize out-of-state marriages.

Barton and Phillips nevertheless argue that this Court's prior decision established, as law of the case, that they must bring their recognition claim against Smith. Aplee.Br.72-73. But this Court did not even consider the standing question presented here—namely, whether Smith is the appropriate defendant for Barton and Phillips's claim that Oklahoma must recognize their California marriage license. Before the first appeal in this case, the District Court held that Barton and Phillips lacked standing to challenge Part B based on their Vermont civil union and their Canadian marriage certificate. *Bishop v. Oklahoma*, 447 F. Supp. 2d 1239,

1256 (N.D. Okla. 2006). Plaintiffs did not appeal that decision. It was only following remand after the first appeal that Barton and Phillips amended their complaint to include a reference to their California marriage license. Aplt.App.036 ¶12. And even later still (over two years following remand) was the first time that those Plaintiffs indicated at a scheduling conference that they intended to challenge Part B based on their California marriage license. Aplt.App.044. This Court's prior decision thus did not address—let alone establish as law of the case—that Smith is the proper defendant for Barton and Phillips's claim that Oklahoma must recognize their California marriage license.

In addition to this gaping hole in Plaintiffs' law-of-the-case argument, there are two other reasons why the law-of-the-case doctrine does not apply here. First, that doctrine "is not a fixed rule that prevents a federal court from determining the question of its own subject matter jurisdiction in a given case." *Baca v. King*, 92 F.3d 1031, 1035 (10th Cir. 1996). In other words, the constitutional concerns "implicated by the issue of standing . . . trump the prudential goals" of the law-of-the-case doctrine. *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 118 (3d Cir. 1997). Second, the law-of-the-case doctrine does not apply "when the [prior] decision was clearly erroneous." *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143 (10th Cir. 2006). Thus, if this Court were to construe its prior decision as Plaintiffs suggest, that opinion would be clearly

erroneous because Smith plainly has no authority to recognize out-of-state marriages.

Barton and Phillips fault Smith for not "identify[ing] any other official . . . who should have been sued instead" of her. Aplee.Br.74 n.37. Yet it is Plaintiffs who "bear[] the burden of establishing" standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and thus it is their job to determine the proper official to sue when raising their recognition claim. Furthermore, the appropriate defendant for Barton and Phillips's recognition claim depends, in part, on the purpose for which they seek recognition of their California marriage license.[12]

Plaintiffs also attempt to create a factual conflict where none exists. They assert that Smith's answer, wherein she affirmed that she is "responsible for the enforcement of the laws challenged by Plaintiffs' First Amended Complaint," conflicts with the statement in her affidavit declaring that she does not have authority to recognize out-of-state marriage licenses. Aplee.Br.75. But Plaintiffs' amended complaint, as the District Court acknowledged, lacked any "language" "address[ing] Part B" of the Marriage Amendment, Aplt.App.044; thus, Smith's statement that she enforces the laws challenged in the amended complaint did not refer to Part B. It was only because all "[p]arties agree[d] that plaintiffs' motion for

---

[12] For example, if Plaintiffs Barton and Phillips want to file a joint tax return with the State, then the state official in charge of that process would be an appropriate defendant.

summary judgment w[ould] address Part B . . . , notwithstanding the absence of such language in the Amended Complaint[,]" *id.*, that Plaintiffs were able to challenge Part B without "amend[ing] [the] complaint" again. *Id.* Therefore, no conflict exists between the allegations in Smith's answer and the statements in her affidavit.

## B. Plaintiffs Cannot Invoke State Severability Principles to Expand the Court's Jurisdiction.

Plaintiffs invoke state severability doctrine in a thinly veiled attempt to fix Barton and Phillips's lack of standing. Aplee.Br.78-80. In particular, Plaintiffs argue that this Court should strike down the Marriage Amendment in its entirety because Part A (the definitional provision) is not severable from Part B (the recognition provision). *Id.* But regardless of whether Plaintiffs Bishop and Baldwin have standing to challenge Part A (an issue disputed above, *see supra* at 44-46), Plaintiffs Barton and Phillips cannot use state severability doctrine to invalidate a portion of the Marriage Amendment that they lack standing to challenge. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997) (declining to address severability question because the plaintiffs before the Court did not have standing to challenge the potentially severable provisions); *Frank v. United States*, 129 F.3d 273, 275-76 (2d Cir. 1997) (same).

Nor can Barton and Phillips derive standing to challenge Part B from the alleged standing of Bishop and Baldwin to challenge Part A. Standing "is not

dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996). Plaintiffs "cannot rest [their] claim to relief on the legal rights or interests of [others]." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). They must "demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). They, however, have failed to do that here.

In addition to these jurisdictional constraints, this Court should decline to address Plaintiffs' severability argument because they did not raise that issue below and thus have waived it. *See, e.g.*, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 951 n.10 (9th Cir. 2011) (en banc) (concluding that a party waived an "argument regarding severability" of an unconstitutional ordinance); *Am. Meat Inst. v. Pridgeon*, 724 F.2d 45, 47 (6th Cir. 1984) (concluding that a party waived its "argument on severability" of a state statute declared unconstitutional because the party brought the "issue before the District Court in . . . an untimely fashion").

### C.    Plaintiffs Barton and Phillips's Recognition Claim Lacks Merit.

Trying once more to draw a parallel between this case and *Windsor*, Plaintiffs Barton and Phillips assert that, like DOMA, the Marriage Amendment violates the Constitution by declining to treat as married same-sex couples who have received a marriage license from another State. Aplee.Br.26-27, 69. But this attempted comparison yet again glosses over a critical distinction between *Windsor*

and this case: the government actor that declined to recognize a marriage in *Windsor* (the federal government) had "no authority . . . on the subject of marriage," 133 S. Ct. at 2691 (quotation marks omitted), and had always "accept[ed] state definitions of marriage," *id.* at 2693; by contrast, the government actor that declines to recognize an out-of-state union here (the State of Oklahoma) has "essential authority to define the marital relation" within its borders. *Id.* at 2692. Thus, this Court should conclude that when declining to recognize a marriage license issued by another State, the State of Oklahoma (a sovereign entity with unquestioned authority over marriage) can surely "do what the federal government cannot." Aplee.Br.68 (quotation marks omitted).[13]

The staggering implications of Barton and Phillips's recognition claim starkly illustrate its foundational flaws. That constitutional theory, if credited, would effectively require Oklahoma to conform its marriage policy to the varying marriage policies enacted in other States. That, in turn, would terminate States' ability to serve as "laboratories" that independently experiment with domestic-relations (and other social) policy. *See Oregon v. Ice*, 555 U.S. 160, 171 (2009);

---

[13] Barton and Phillips claim that the Marriage Amendment is worse than DOMA because it "makes them *unmarried* to each other." Aplee.Br.69. Yet as Plaintiffs' own amici illustrate, the federal government will still recognize Barton and Phillips's California marriage license and treat them as married for myriad federal purposes because their union was "legal where it was celebrated." OutServe-SLDN Amicus Br. at 6; *see also* Bay Area Lawyers Br. at 18 n.7 (listing 12 federal agencies that recognize marriages between same-sex couples).

*New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *see also* Center for Constitutional Jurisprudence Br. at 11-13. Rather than fostering the States' freedom to experiment with different approaches to difficult social questions, Plaintiffs' theory would empower one laboratory to commandeer the others, essentially nationalizing the marriage policy of the most inventive State. Thus, for example, if one State were to legalize plural or polyamorous marriages, Oklahoma (like all other States) would be forced to recognize those unions, notwithstanding its state constitutional prohibition on "plural marriages." Okla. Const. art. I, § 2. Yet the heart of *Windsor* condemns such a nationalization of marriage policy. *See* Aplt.Br.28-31.

Barton and Phillips's constitutional theory, moreover, would require all States to replace the man-woman marriage institution with a genderless variety. After all, forcing a State to recognize out-of-state marriages that conflict with its core definition would *de facto* disable that State from maintaining its chosen marital definition. Even Plaintiffs admit that the Marriage Amendment's definitional provision "by itself" would not completely achieve the Amendment's purpose of preserving the man-woman marriage institution in Oklahoma. Aplee.Br.79-80.

Ironically, the recognition claim pressed here would place States that have redefined marriage in the marriage-meddling role played by the federal

government in *Windsor*, coercing them to mirror Congress's error of interfering with the marriage policy of various States. Yet *Windsor* counsels against one government dictating the marriage policy of another. *Cf.* 133 S. Ct. at 2693 (denouncing the federal government's "influence [over] a state's decision as to how to shape its own marriage laws" (quotation marks omitted)). Rather, *Windsor* supports allowing each State to establish its own definition of marriage. *See, e.g.*, *id.* at 2692 (affirming the right of New Yorkers to define marriage for themselves).

Ignoring these indefensible implications, Plaintiffs Barton and Phillips argue that the Marriage Amendment violates equal-protection principles because, they claim, it is unusual for the State to decline to recognize marriages licenses issued by another State. Aplee.Br.70 (arguing that Oklahoma law recognizes "virtually" all out-of-state marriages). But the premise of this argument—that it is unusual for the State to decline to recognize marriages solemnized elsewhere—is simply not true.[14]

"Every sovereign state," including Oklahoma, "may determine the status of those having their domicile within its territory." *Ross v. Bryant*, 217 P. 364, 365

---

[14] Barton and Phillips also argue that *Loving* supports their recognition claim because the State of Virginia refused to recognize the marriage that the *Loving* couple entered in the District of Columbia. Aplee.Br.69-70. But unlike this case, *Loving* involved the deeply rooted fundamental right to marry and invoked the core purpose of the Fourteenth Amendment (eliminating racial discrimination). *See* Center for Constitutional Jurisprudence Br. at 15. Thus, as explained above, *Loving* does not advance Plaintiffs' claims. *See supra* at 41-43. That conclusion applies equally to Barton and Phillips's recognition claim.

(Okla. 1923). In making those determinations, Oklahoma (like other States) "undoubtedly . . . has the power to declare that marriages between its own citizens contrary to its established public policy shall have no validity in its [borders], even though they be celebrated in other states, under whose laws they would ordinarily be valid." *Atkeson v. Sovereign Camp, W.O.W.*, 216 P. 467, 470 (Okla. 1923), *superseded by statute on other grounds as recognized in Plummer v. Davis*, 36 P.2d 938, 941 (Okla. 1934); *see also* Restatement (Second) of Conflict of Laws § 283(2) (1971) (stating that even if a marriage "satisfies the requirements of the state where the marriage was contracted," that marriage will not "be recognized as valid" if "it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage").

These marriage-recognition principles are firmly rooted in the law of comity. Comity is "the courtesy by which [States] recognize within their own territory, or in their own courts, the peculiar institutions of another." *Myatt v. Ponca City Land & Improvement Co.*, 78 P. 185, 188 (Okla. 1903); *see also Hilton v. Guyot*, 159 U.S. 113, 164 (1895) (comity determines "the recognition which one [sovereign] allows within its territory to the legislative, executive or judicial acts of another"). Like other States, Oklahoma does not extend comity when doing so would be "contrary to its known policy." *Myatt*, 78 P. at 188; *see also Coffe & Carkener v.*

*Wilhite*, 156 P. 169, 172 (Okla. 1916) (stating that Oklahoma will not recognize a contract if it contravenes the State's "public policy").

Federal full-faith-and-credit principles, *see* U.S. Const. art. IV, § 1, which Plaintiffs have not raised here, dictate the same analysis when assessing marriage-recognition issues. "In applying the Full Faith and Credit Clause, the Supreme Court has drawn a distinction between statutes and judgments." *Finstuen*, 496 F.3d at 1152 (citing *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 232-33 (1998)). Here, marriage licenses issued by other States are not *judgments*, but rather reflect the operation of another State's marriage *statutes*. Yet "[t]he Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" *Baker*, 522 U.S. at 232 (quoting *Pac. Employers Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 501 (1939)). Instead, a State may decline to recognize another's statutes if affording such recognition "would violate [that State's] own legitimate public policy." *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 497 (2003).[15]

---

[15] Plaintiffs (at p. 72 and n.36) seek support from this Court's decision in *Finstuen*, which resolved a full-faith-and-credit question concerning a foreign adoption judgment. 496 F.3d at 1151-52. But Plaintiffs have not raised any full-faith-and-credit claims here, and even if they had, *Finstuen* itself observed the drastic difference between full-faith-and-credit analysis of other States' judgments (at issue there) and other States' statutes (at issue here). *Id.* at 1152 (citing *Baker*, 522 U.S. at 232-33). *Finstuen* thus does not advance Plaintiffs' legal position.

Oklahoma marriage-recognition principles, in particular, demonstrate that there is nothing unusual about the State's decision not to recognize Plaintiffs Barton and Phillips's out-of-state marriage license. "[T]he law of the domicile of the parties governs the status of marriage" in Oklahoma. *Ross*, 217 P. at 365. "[T]he state of the domicile of the parties intending to enter into the marriage relation has the exclusive right to prescribe all terms, conditions, and limitations which are binding upon the parties, although the law of the jurisdiction in which the marriage contract was entered into may have permitted the marriage within its borders." *Id.* at 366.

Thus, for nearly 100 years, the Oklahoma Supreme Court has held that individuals domiciled within its borders cannot travel to another State, enter a marriage that could not be formed in Oklahoma, and demand recognition of their out-of-state union upon returning:

> If a man and woman, citizens of the same state, and subject to an absolute statutory prohibition against entering into a marriage . . . , leave their domicile and enter another state, where a marriage between them is not prohibited, and there marry for the purpose of evading the law of their domicile, such marriage is void in the state having the prohibition. Persons domiciled in one state, where marriage between them is absolutely prohibited, cannot evade its laws and policy by going to another state, and there marrying, and then returning to the home state to reside. Such marriage is void in the latter state.

*Id.* at 365-66 (quotation marks omitted); *see also Atkeson*, 216 P. at 469 (stating that when a State has enacted a law "imposing upon its citizens an incapacity to

contract marriage by reason of a positive policy of the state . . . , a marriage contracted in disregard of the prohibition of the statute, wherever celebrated, will be void" (quoting *Wilson v. Cook*, 100 N.E. 222, 223 (Ill. 1912))). A State needs this authority to decline to recognize these sorts of evasive marriages in order to ensure that its citizens cannot "nullify" or render "essentially useless" the State's marriage laws. *See Atkeson*, 216 P. at 470.

Oklahoma thus has not acted unusually in declining to recognize Barton and Phillips's California marriage license. Indeed, that decision falls squarely within the State's longstanding refusal to recognize foreign legal unions entered by its domiciliaries for the purpose of evading Oklahoma law. Barton and Phillips, who have now "lived in Oklahoma for over fifty years," admittedly "traveled to California," "married under that state's laws," and returned to "their home state" of Oklahoma. Aplee.Br.7-8. But Oklahoma has never recognized such legal unions formed in other States. Regardless of whether the out-of-state union was formed by a same-sex couple or an opposite-sex couple, if the Oklahoma couple traveled to another State to evade Oklahoma law, the State has consistently declined to recognize such unions. *See, e.g.*, *Ross*, 217 P. at 366 (invalidating an out-of-state marriage of a minor that fell "within the express inhibitions of the law of the state of Oklahoma"); *Atkeson*, 216 P. at 470 (declining to recognize a marriage of a recent divorcee who made "a temporary visit to the state of Texas" while "under

the restrictions imposed [on recent divorcees] by the laws of [Oklahoma]"). Hence, Oklahoma's decision not to recognize Barton and Phillips's California marriage license is neither unprecedented nor unusual. Plaintiffs' recognition claim thus lacks merit.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's decision.

Dated: April 1, 2014

Respectfully submitted,

s/ Byron J. Babione
Byron J. Babione
David Austin R. Nimocks
James A. Campbell
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020 (t); (480) 444-0028 (f)
bbabione@alliancedefendingfreedom.org

John David Luton
Assistant District Attorney
District Attorney's Office (Tulsa)
500 South Denver Ave., Suite 900
Tulsa, OK 74103
(918) 596-4814 (t); (918) 596-4804 (f)
jluton@tulsacounty.org

*Attorneys for Sally Howe Smith*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A) because it contains 13,881 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a 14-point proportionally spaced Times New Roman typeface using Microsoft Word 2007.

Date: April 1, 2014                        s/ Byron J. Babione
                                            Byron J. Babione

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify (1) that all the required privacy redactions have been made as required by Tenth Circuit Rule 25.5, (2) that the submitted hard copies are an exact copy of the ECF submission, and (3) that the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Sophos Endpoint Security and Control, Version 10.3, and are free of viruses according to that program.

Date: April 1, 2014                              s/ Byron J. Babione
                                                          Byron J. Babione

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2014, a true and accurate copy of this brief was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

Don Gardner Holladay
dholladay@holladaychilton.com

James Edward Warner, III
jwarner@holladaychilton.com

Joseph Thai
thai@post.harvard.edu

*Attorneys for Plaintiffs*


Date: April 1, 2014                              s/ Byron J. Babione
                                                 Byron J. Babione